```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
                                                                   :
  UNITED STATES OF AMERICA,                                        :
                                                                   :
                                                                   :   1:23-cr-00198 (ALC)
               -against-                                           :
                                                                   :   OPINION
                                                                   :
  TERRY MITCHELL,                                                  :
                                                                   :
                             Defendant.                            :
                                                                   :
                                                                   :
------------------------------------------------------------------ :
                                                                   :
                                                                   :
                                                                   x
```

**ANDREW L. CARTER, JR., District Judge:**

      The government indicted Terry Mitchell for unlawfully possessing a firearm in violation of 18 U.S.C. § 922(g)(1). ECF No. 1, Compl. The statute criminalizes gun and ammunition possession by "any person" who "has been convicted in any court of [] a crime punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 922(g)(1). Relying on *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), Defendant moves to dismiss the indictment, bringing facial and as-applied challenges to § 922(g)(1), alleging § 922(g)(1) violates the Second Amendment. ECF Nos. 21–22. Mr. Mitchell argues that (1) felons are among "the people" in the Second Amendment; (2) the government has failed to meet its burden under the *Bruen* framework to show that the felon-in-possession statute "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126–27; and (3) because Mr. Mitchell is a non-violent felon, the statute is unconstitutional as applied to him. ECF No. 22. The government opposes the motion and contends that (1) felons are not protected by the Second Amendment; (2) it has shown the statute is in fact "consistent with this Nation's historical

1

tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126–27; (3) Mr. Mitchell is foreclosed from bringing an as-applied challenge to § 922(g)(1); and (4) even if the Court were to consider Defendant's as-applied challenge, the statute must be upheld because this country has a historical tradition of disarming non-violent felons.

For the reasons stated below, Defendant's motion to dismiss the indictment is **DENIED**. Felons are among "the people" in the Second Amendment. However, the government has shown the historical record supports applying restrictions on felons' possession of guns, regardless of the type of felony committed.

## BACKGROUND

Law enforcement learned of Mr. Mitchell's § 922(g)(1) violation due to Defendant's brazen and dangerous conduct. Two of his neighbors claim Mr. Mitchell threatened and menaced them with a black handgun. Compl. at ¶ 4b; ECF No. 9 at 2. Defendant is accused of waving a gun and threatening a fellow tenant as the tenant swept the sidewalk in front of the building. Compl. at ¶ 4b. Approximately one month earlier, Defendant had blocked entry to the building to another tenant and lifted his shirt to display a handgun in his waistband. ECF No. 9 at 2. On October 21, 2022, the police executed a search warrant and discovered a handgun and ammunition at Defendant's residence. Compl. at ¶ 4f–h. The government has reason to believe the handgun law enforcement confiscated in Mr. Mitchell's home was the very gun Defendant allegedly used to terrorize his neighbors.

Mr. Mitchell has three prior felony convictions for criminal sale of and/or possession with intent to sell a controlled substance. *Id.* at ¶ 2.

Defendant moved to dismiss the indictment on August 28, 2023. ECF No. 21. The government filed its opposition on September 18, 2023. RCF No. 23. Mr. Mitchell filed his reply

on September 29, 2023. ECF No. 25. The Court held oral argument on October 27, 2023, at which the government provided the Court and counsel with a copy of Attorney General Garland's petition for a writ of certiorari to the Third Circuit in *Range v. Atty Gen. United States of Am.*, 69 F.4th 96 (3d Cir. 2023). Defendant filed his response to the petition on October 27, 2023. ECF No. 29. This motion is fully briefed.

## DISCUSSION

### I. Section 922(g)(1) Is Facially Constitutional.

The Second Amendment mandates that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court clearly approves of "longstanding prohibitions on the possession of firearms by felons" supported by "historical analysis" and "historical justifications[.]" *District of Columbia v. Heller*, 554 U.S. 570, 626–27, 635 (2008). *See also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality) (*Heller* "recognized that the right to keep and bear arms is not 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose'") (quoting *Heller*, 554 U.S. at 626). *Bruen* itself recognizes that the Second Amendment is "subject to certain reasonable, well-defined restrictions." 142 S. Ct. at 2156. Further, "nothing in [*Bruen*'s] analysis should be interpreted to suggest the unconstitutionality of . . . shall-issue licensing regimes" "which often require applicants to undergo a background check" and "are designed to ensure . . . that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens." *Id.* at 2138 n.9.[1] Because six Justices in *Bruen* reaffirmed the language in *Heller*, and the Court signaled its approval of shall-issue licensing

---

[1] *See also id.* at 2157 (Alito, J., concurring) (*Bruen* did not "disturb[] anything that [was] said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns."); *id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) (the Second Amendment is subject to gun regulations).

3

regimes and background checks, this Court must conclude that *Bruen* itself is consistent with *Heller* and *McDonald*. *Vincent v. Garland*, 80 F.4th 1197, 1202 (2023) (10th Cir.) ("*Bruen* did not indisputably and pellucidly abrogate" the Tenth Circuit's opinion upholding the constitutionality of § 922(g)(1)); *United States v. Sternquist*, No. 22-CR-473(DLI), 2023 WL 6066076, at *5 (E.D.N.Y. Sept. 15, 2023) (*Bruen* makes it "abundantly clear that *Heller* and *McDonald* stand as controlling precedents") (citing *United States v. King*, 634 F. Supp. 3d 76, 83 (S.D.N.Y. 2022)) (internal quotations omitted).

Because *Heller* and *McDonald* remain controlling precedents, *Bruen* does not invalidate the felon-in-possession statute. Consistent with these precedents, the Second Circuit has affirmed that § 922(g)(1) is "a constitutional restriction on the Second Amendment rights of convicted felons." *United States v. Bogle*, 717 F.3d 281, 282 (2d Cir. 2013) (per curiam). Defendant argues the Court's reassurances in *Heller* and *McDonald* are dicta. However, the Second Circuit in *Bogle* adopted the "'dicta' in *Heller* and *McDonald* [as] binding precedent." *United States v. Hampton*, No. S2 21-CR-766 (JPC), 2023 WL 3934546, at *12 (S.D.N.Y. June 9, 2023). "With *Heller* and *McDonald* still in full force after *Bruen*, *Bogle* remains binding precedent within this Circuit on the constitutionality of section 922(g)." *Id.* (citing *United States v. Garlick*, No. 22-CR-540 (VEC), 2023 WL 2575664, at *5 (S.D.N.Y. Mar. 20, 2023)). *See also United States v. Warren*, 22-CR-231(DLI), 2023 WL 5978029, at *5 (E.D.N.Y. Sept. 14, 2023) (collecting cases). "It is a longstanding rule that a panel of our Court is bound by the decisions of prior panels until such times as they are overruled either by an en banc panel of our Court or by the Supreme Court." *United States v. Peguero*, 34 F.4th 143, 158 (2d Cir. 2022) (internal quotation marks omitted). Thus, the Second Circuit should decide whether or not to overturn *Bogle* in light of subsequent Supreme Court decisions, not the district court.

Even if *Bogle* were not binding, the Court would deny Defendant's motion under *Bruen*.

### a. *Bruen* Lays Out a Framework for Analyzing § 922(g)(1).

The Supreme Court in *Bruen* established a new two-step framework for analyzing Second Amendment claims. It rejected the "means-end scrutiny" framework employed by courts to examine "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right." 142 S. Ct. at 2126–27 (citation and internal quotation marks omitted). Instead, under *Bruen* a court must analyze "how and why [a] regulation burden[s] a law-abiding citizen's right to self-defense." *Id.* at 2132–33. At step one, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct[.]" *Id.* at 2126. At step two, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation" by "affirmatively prov[ing] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2126–27.

"When confronting . . . present-day firearm regulations, [the] historical inquiry that courts will conduct will often involve reasoning by analogy[.]" *Id.* at 2132. The Court recognized that "the Second Amendment's historically fixed meaning applies to new circumstances," and "can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.* at 2132. *Bruen*'s "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2133 (emphasis in original). "[A] modern-day regulation" need not be "a dead ringer for historical precursors" but it must be "analogous enough to pass constitutional muster." *Id*.

*Bruen*'s framework "requires a court to compare historical laws of general application to modern counterparts." *United States v. Lane*, No. 5:22-CR-132, 2023 WL 5614798, at *5 (D. Vt.

Aug. 24, 2023). "[T]he regulations must be 'relevantly similar' in light of 'at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense.'" *United States v. Davila*, No. 23-CR-292 (JSR), 2023 WL 5361799, at *1 (S.D.N.Y. Aug. 22, 2023) (quoting *Bruen*, 142 S. Ct. at 2132–33). Courts must then analyze "[1] whether modern and historical regulations impose a comparable burden on the right of armed self-defense"; and "[2] whether that burden is comparably justified." *Bruen*, 142 S. Ct. at 2133.

### b.  Step 1: Felons Are "People" Covered by the Plain Text of the Second Amendment.

At step one, the Court must determine whether a defendant's conduct falls within the Second Amendment's scope. "A person's legal status—being a convicted felon—is different and distinct from a person's conduct—possessing a firearm." *Lane*, 2023 WL 5614798, at *5. "The Supreme Court has been clear that this initial inquiry into the application of the Second Amendment focuses on *conduct*, not status." *Id.* (emphasis in original); *see also United States v. Bullock*, 2023 WL 4232309, at *20 (S.D. Miss. June 28, 2023) (same). "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126.

In this case, Defendant's possession of a handgun indisputably qualifies as conduct covered by the Second Amendment. *Heller*, 554 U.S. at 628. Defendant contends "the people" in the Second Amendment includes felons. *Davila*, 2023 WL 5361799, at *2. The government insists the Second Amendment's protections extend only to "ordinary, law-abiding, adult citizens," *Bruen*, 142 S. Ct. at 2134, who are "members of the political community," *Heller*, 554 U.S. at 580, and as such, exclude felons. The government's reading of the Second Amendment is untenable. The Court in *Heller* determined that "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an

6

unspecified subset." 554 U.S. at 580. As such, there is "a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 580–81. *See also United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990) ("'[T]he people' seems to have been a term of art employed in select parts of the Constitution" referring "to a class of persons who are part of a national community").

The Second Amendment must then also share an expansive reading of "the people" under its protection to include all members of the political community, including felons. As the Third Circuit did in *Range*, I "reject the Government's contention that only law-abiding, responsible citizens are counted among the people protected by the Second Amendment" because "*Heller* and its progeny lead[s] [me] to conclude that [Defendant] remains among the people despite" his felony conviction. 69 F.4th at 103. Many courts have held the same. *See United States v. White*, No. 23-CR-140 (NSR), 2023 WL 6066201, at *4 (S.D.N.Y. Sept. 18, 2023) (rejecting argument that felons are "completely removed from the scope of the Second Amendment's protection.") (citation omitted); *United States v. Rowson*, No. 22-CR-310 (PAE), 2023 WL 431037, at *15 (S.D.N.Y. Jan. 26, 2023) (same); *Davila*, 2023 WL 5361799, at *2 ("There is no basis for reading 'the people' in the text of the Second Amendment to exclude felons[.]"); *Bullock*, 2023 WL 4232309, at *21 (same).

As such, Defendant's possession of a gun is conduct covered by the Second Amendment's plain text, and "the people" in the text of the Second Amendment includes all members of the political community.

    **c. Step 2: Section 922(g)(1) Complies with the U.S.'s Historical Tradition of Firearms Regulation.**

At step two, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation" by "affirmatively prov[ing] that its firearms

7

regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2126–27. "Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* at 2129–30.

Mr. Mitchell argues § 922(g)(1) is not consistent with this Nation's historical tradition because "there were no broad-sweeping felon-disarmament laws in place when the Second Amendment was adopted in 1791." ECF No. 22 at 6. This argument has no merit. *Bruen* requires the government to "identify a well-established and representative historical *analogue*, not a historical *twin*" or a "dead ringer[.]" 142 S. Ct. at 2133 (emphasis in original). The regulation must be "analogous enough to pass constitutional muster." *Id.* Regulations proposed as historical analogues must meet *Bruen*'s metrics of "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33. Thus, *Bruen* demands an analogue, not a twin.

### i. There Exist Historical Analogues To § 922(g)(1).

The government examined English, colonial, and early American laws, and identified multiple categories of regulations on firearms that it contends are historical analogues to § 922(g)(1): "(a) laws categorically disqualifying groups from possessing firearms based on a judgment that the group could not be trusted to adhere to the rule of law; and (b) laws authorizing capital punishment and estate forfeiture for felonies." ECF No. 23 at 13.

The first category of laws encompasses a broad array of regulations, namely laws disarming (1) certain religious groups; (2) enslaved peoples, Native Americans, and others on the basis of race; and (3) persons suspected of being disloyal to the government. The government cites to an act in England passed in 1689 "disarming Papists and reputed Papists," disarming any Catholic who refused to make a declaration renouncing his or her faith. 1 W. & M., Sess. 1, c. 15, in 6 The Statutes of the Realm 71–73 (1688). The English government viewed Catholics who

refused to renounce their faith as "unwilling to obey the government and its laws." *Jackson*, 69 F.4th at 502.[2] Parliament also limited Protestants' access to arms "for their Defence suitable to their Conditions and as allowed by Law." 1 W. & M., Sess. 2, c. 2, in 6 The Statutes of the Realm 143 (1688). In colonial America, the government continued the English tradition of disarming Catholics who refused to take an oath of allegiance. Joseph G.S. Greenlee, The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms, 20 Wyo. L. Rev. 249, 263 (2020) (citing arms restrictions in Maryland, Virginia, and Pennsylvania).

The colonies also disarmed enslaved peoples and Native Americans[3] on the basis that the groups were "potentially dangerous." Michael A. Bellesiles, Gun Laws in Early America: The Regulation of Firearms Ownership, 1607-1794, 16 Law & Hist. Rev. 567, 576 (1998) ("[L]egislatures followed the English example in denying the right to own guns to potentially dangerous groups: [B]lacks, slave and free; Indians; propertyless whites; non-Protestants or potentially unruly Protestants."). "Laws disarming groups such as slaves, freed blacks, Indians,

---

[2] *See also Range*, 69 F.4th at 124 (en banc) (Krause, J., dissenting) ("[T]he English practice of disarming Catholics based on their perceived unwillingness to adhere to the King's sovereign dictates.") (citing Nicholas J. Johnson et al., Firearms Law and the Second Amendment: Regulation, Rights, and Policy 174 (3d ed. 2022)).

[3] *See* Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* 28-29 (2006); *see also, e.g.*, *Laws and Ordinances of New Netherland*, 1638-1674, at 18–19 (1868) (1639 New Netherland law); 1 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 255-56 (1823) (1643 Va. law); 5 *Records of the Colony of New Plymouth* 173 (1856) (1675 Plymouth law); 2 *Records of the Colony of Rhode Island and Providence Plantations* 561 (1857) (1677 R.I. law); 2 *The Statutes at Large; Being a Collection of All the Laws of Virginia* 481-82 (1823) (1680 Va. law); *Grants, Concessions, and Original Constitutions of the Province of New Jersey: The Acts Passed During the Proprietary Governments, and Other Material Trans-actions Before the Surrender Thereof to Queen Anne* 341 (1753) (1694 N.J. law); 2 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 235 (1896) (1706 Pa. law); 1 *The Laws of Mary-land, With the Charter, the Bill of Rights, the Constitution of the State, and Its Alterations, the Declaration of Independence, and the Constitution of the United States, and Its Amendments* 117-18 (1811) (1715 Md. Law); 6 *The Public Records of the Colony of Connecticut* 381-82 (1872) (1723 Conn. law); *Laws of New York From the Year 1691 to 1773*, at 199 (1752) (1730 N.Y. Law); *A Complete Revisal of All the Acts of Assembly, of the Province of North-Carolina, Now in Force and Use* 152-54 (1773) (1753 N.C. law); 6 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 319–20 (1899) (1763 Pa. law); *Digest of the Laws of the State of Georgia from Its First Establishment as a British Province Down to the Year 1798, Inclusive, and the Principal Acts of 1799*, at 153–55 (1800) (1768 Ga. Law).

and those of mixed-race ancestry were common." *Davila*, 2023 WL 5361799, at *3; *see also White*, 2023 WL 6066201, at *5 (same).

During the Revolutionary War, legislatures disarmed those suspected of being disloyal to the new American government. *Jackson*, 69 F.4th at 503; *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776*, at 1993 (1890) (1775 Connecticut law barred persons convicted of libel or defamation of the Connecticut legislature and the Continental Congress from keeping arms).

The government also presents evidence that during ratification, Antifederalist delegates at the Pennsylvania ratifying convention for the Constitution "proposed a right to bear arms that was unqualified 'unless for crimes committed, or real danger of public injury from individuals.'" *White*, 2023 WL 6066201, at *5 (quoting Bernard Schwartz, The Bill of Rights: A Documentary History 627 (1971)). "The use of the word 'or' indicates that criminals, in addition to those who posed a 'real danger' (such as the mentally ill, perhaps), were proper subjects of disarmament." *Medina v. Whitaker*, 913 F.3d 152, 157–61 (D.C. Cir. 2019), *cert. denied*, 140 S. Ct. 645 (2019). Delegates at the Massachusetts and New Hampshire conventions also proposed limiting the right to bear arms to law-abiding citizens. Schwartz at 675, 681, 758, 761.

The Court rejects the abhorrent and morally corrupt historical regulations barring individuals from possessing firearms or ammunition on the basis of race, religious affiliation, and suspected disloyalty. These laws undoubtedly would not pass constitutional muster today. Despite this, several courts have found these laws relevant in determining the constitutionality of the felon-in-possession statute. *See Jackson*, 69 F.4th at 503 (These "categorical prohibitions of course would be impermissible today under other constitutional provisions, [yet] they are relevant here in determining the historical understanding of the right to keep and bear arms."); *Davila*, 2023 WL

10

5361799, at *3 (admitting "viewing those groups as dangerous or untrustworthy is odious and completely contrary to American law and societal values today" but "[t]he historical regulations need not be commendable, or even lawful today under other constitutional provisions, to serve as relevant comparators for the analysis *Bruen* requires.").

This Court does not need to uphold the constitutionality of § 922(g)(1) on these repulsive historical regulations. *Bruen* of course requires a robust historical analysis. But it cannot stand for the proposition that the government has license to conduct a digging expedition into the past, and that it should rely on questionable ill-reasoned regulations to justify burdening an individual's constitutional right to bear arms in the present day. There is undoubtedly a plethora of irrational and unjustified regulations in English and this country's histories founded at their core on discrimination. The government may not satisfy *Bruen* by relying on these laws, particularly when better suited historical analogues are available. Setting aside the morally corrupt reasoning justifying these historical regulations, this Court fails to see how race or religious-based restrictions are at all analogous to the disarming of felons. Casting such a broad net of legislation would render *Bruen*'s analogous requirement meaningless.

This is not to say the government has not met its burden under *Bruen*. It has shown the existence of a historical analogue to § 922(g)(1): laws authorizing estate forfeiture for felonies. In England, William Blackstone defined a felony as "an offence which occasions a total forfeiture of either lands, or goods, or both, at the common law; and to which capital or other punishment may be superadded, according to the degree of guilt." 4 William Blackstone, Commentaries on the Laws of England 95 (1769). "The idea of felony is indeed so generally connected with that of capital punishment, that we find it hard to separate them." *Id.* at 98.

In colonial America, capital punishment was "'the standard penalty for all serious crimes.'" *Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., joined by Scalia, J., concurring in the judgment) (quoting Stuart Banner, *The Death Penalty: An American History* 23 (2002)). The First Congress made both violent and non-violent felonies eligible for capital punishment. An Act for the Punishment of Certain Crimes Against the United States, 1 Stat. 112-15 (1790). The same was true of the states. *Medina*, 913 F.3d at 159; *Jackson*, 69 F.4th at 503. Until 1800, states authorized the complete forfeiture of a felon's estate. *See* Beth A. Colgan, Reviving the Excessive Fines Clause, 102 Cal. L. Rev. 277, 332 & nn. 275–76 (2014) (citing statutes). *See also* Richard E. Finneran & Steven K. Luther, Criminal Forfeiture and the Sixth Amendment: The Role of the Jury at Common Law, 35 Cardozo L. Rev. 1, 6, 32–42 (2013).

"That the founders understood felons to be punishable by death and estate forfeiture leaves little doubt that they also understood that felons could be permissibly disarmed." *Davila*, 2023 WL 5361799, at *4. *See also Medina*, 913 F.3d at 158 (same); *White*, 2023 WL 6066201, at *6 ("It is a difficult row to hoe to suggest the generation that drafted and enacted the Second Amendment could countenance capital punishment for a non-violent felony, but not a prohibition on the possession of arms and ammunition."). Of course, the punishment for felonies in modern day has been reformed, and in most cases, is no longer as severe. But the very existence of estate forfeiture logically includes a felon's forfeiture of their arms and ammunition. The government has established that estate forfeiture laws were imposed on felons in England and in colonial America.

### ii. Estate Forfeiture Laws And § 922(g)(1) Are Sufficiently Analogous.

Next, the Court must draw comparisons between estate forfeiture laws and the felon-in-possession statute. Estate forfeiture laws easily satisfy the analogue requirements in *Bruen*. The "how", "disqualifying categories of people from possessing firearms" of estate forfeiture laws is

12

identical to § 922(g)(1). *Davila*, 2023 WL 5361799, at *5 (finding race and religious-based disarmament, total forfeiture, and capital punishment of felons was sufficiently analogous to § 922(g)(1)). The "why" is also identical – the legislature then and now viewed felons as "dangerous to an ordered society and [], inherently, not in compliance with legal norms." *White*, 2023 WL 6066201, at *6 (government met its *Bruen* burden by relying on religious and racial restrictions on gun ownership, total forfeiture, and capital punishment) (citing *Davila*, 2023 WL 5361799, at *5). In both cases, the regulations aimed "to remove guns from the hands of those who have harmed society and breached its trust." *Davila*, 2023 WL 5361799, at *5.

### II.  Section 922(g)(1) Withstands Defendant's As-Applied Challenge.
#### a. As-Applied Challenges Generally.

In an as-applied challenge, the Court must analyze "the facts of a particular case to determine whether the application of a statute, even one constitutional on its face, deprived the individual to whom it was applied of a protected right." *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 174 (2d Cir. 2006). "[I]n the context of an as-applied vagueness challenge, a court's analysis should be confined to the litigant's *actual* conduct, and a court should not analyze whether a reasonable person would understand that certain hypothetical conduct or situations violate the statute." *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 189 (2d Cir. 2010).

However, under the *Bruen* framework, the Court may not consider the facts of a particular case in detail. Rather, a court is confined to determining whether Defendant is in possession of a firearm and whether he is among "the people" in the Second Amendment. This disposes of Defendant's emphasis on Mr. Mitchell's gun possession for self-defense.

#### b. The Statute Is Not Unconstitutional As Applied to Defendant.

Mr. Mitchell argues § 922(g)(1) is unconstitutional as applied to him because he previously committed only non-violent felonies, relying primarily on the Third Circuit's opinion in *Range*.

69 F.4th at 98, 105–106. Defendant's contention runs into multiple hurdles: (1) it is unclear if § 922(g)(1) is even subject to as-applied Second Amendment challenges; (2) Defendant has not shown his circumstances are similar to the defendant in *Range*; (3) Defendant's drug convictions are associated with danger and violence; and (4) there exists historical support for disarming non-violent felons.

First, neither *Bruen* nor any other Supreme Court precedent requires a court to conduct an individualized inquiry by felony pursuant to § 922(g)(1). In *Bogle*, the Second Circuit affirmed that § 922(g)(1) is "a constitutional restriction on the Second Amendment rights of convicted felons." 717 F.3d at 282. *Bogle* did not suggest that the statute was subject to an as-applied challenge. Sister circuits have rejected as-applied challenges to § 922(g)(1). The Tenth Circuit found there was "no basis to draw constitutional distinctions based on the type of felony involved." *Garland*, 80 F.4th at 1202 (rejecting the notion that the court must draw distinctions based on defendant's bank fraud conviction). The Eighth Circuit in *Jackson* denied a non-violent felon's as-applied challenge because, given the Supreme Court's "assurances", "and the history that supports them, there is no need for felony-by-felony litigation regarding [§ 922(g)(1)'s] constitutionality." 69 F.4th at 502–504. *See also Sternquist*, 2023 WL 6066076 at *6 (concurring with the analysis in *Jackson*); *United States v. Cunningham*, 70 F.4th 502, 506 (8th Cir. 2023) (finding *Jackson* foreclosed non-violent felon's as-applied challenge).

Second, Mitchell fails to show that his circumstances are similar to those of the defendant in *Range*. The Third Circuit is the singular Court of Appeals to sustain an as-applied challenge to the validity of § 922(g)(1). The defendant in *Range* committed a state law misdemeanor of food stamp fraud, which qualified as equivalent to a felony under § 922(g)(1) because the offense was eligible for a maximum sentence of five years. 69 F.4th at 98. The Third Circuit's "narrow"

14

decision found the government failed to meet its burden to show "that our Republic has a longstanding history and tradition of depriving *people like Range* of their firearms" and thus "§ 922(g)(1) cannot constitutionally strip him of his Second Amendment rights." *Id.* at 106 (emphasis added). The court found that the government did not show a historical analogue existed for the criminalization of firearm possession by an individual convicted of a single non-violent misdemeanor, in that case a food stamp fraud conviction. *Id.* at 105–106.

Although Mr. Mitchell asks this Court to apply the reasoning in *Range*, he has not made the case that his circumstances are sufficiently similar. *See United States v. Libertad*, No. 22-CR-644 (JSR), 2023 WL 4378863, at *5 (S.D.N.Y. July 7, 2023) (rejecting defendant's as-applied challenge to § 922(a)(3) where he "identified nothing about his circumstances" justifying as-applied relief). Glaringly, Defendant has three narcotics convictions, not a fraud misdemeanor. "Unlike the food stamp fraudster [in *Range*] who [pled] guilty to an unusual state law *misdemeanor*, [Defendant's] prior misconduct [here] involves . . . actual . . . felon[ies]." *United States v. Harrison*, No. 3:22-CR-455, 2023 WL 4670957, at *8 (N.D.N.Y. July 20, 2023) (rejecting challenge by defendant with drug conviction) (emphasis added). Thus, the Third Circuit's decision to uphold that defendant's as-applied challenge was made "in a limited way based on different facts[,]" *Lane*, 2023 WL 5614798, at *6, and the analysis in *Range* does not persuasively resolve Mr. Mitchell's as-applied claim.

Third, Defendant's drug convictions may be non-violent, but the Second Circuit has "repeatedly acknowledged that certain crimes, notably drug trafficking, present a sufficient risk of violence[.]" *United States v. Patterson*, 25 F.4th 123, 143 (2d Cir. 2022) (citing *United States v. Alexander*, 907 F.2d 269, 273 (2d Cir. 1990)). *See also United States v. Millan*, 4 F.3d 1038, 1047–48 (2d Cir. 1993) ("[I]t is clear that the harm to society caused by narcotics trafficking is

15

encompassed within Congress' definition of 'danger.'") (quoting *United States v. Leon*, 766 F.2d 77, 81 (2d Cir.1985)). Defendant's convictions are a result of a dangerous activity, his engagement in selling or possessing narcotics, and this further distinguishes his circumstances from those of the defendant convicted of food stamp fraud in *Range*. Courts repeatedly reject as-applied challenges to § 922(g)(1) brought by defendants convicted of non-violent offenses. *Jackson*, 69 F.4th at 502 (drug convictions); *Cunningham*, 70 F.4th at 504 (drunk driving); *Vincent*, 80 F.4th at 1202 (bank fraud); *Warren*, 2023 WL 5978029, at *6 (drug and conspiracy). This case is no different.

Fourth, the historical record supports applying restrictions on felons' possession of guns, regardless of the type of felony committed. "[D]eath was 'the standard penalty for all serious crimes' at the time of the founding." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1122 (2019) (citation omitted). At the founding and in England, the death penalty extended to non-violent crimes. *Medina*, 913 F.3d at 158; *see also White*, 2023 WL 6066201, at *6 (same). Likewise, the government confiscated all felons' estates. *Austin v. United States*, 509 U.S. 602, 612 (1993); Blackstone at 95; Colgan at 332–34. History "leaves little doubt" that "felons could be permissibly disarmed." *Davila*, 2023 WL 5361799, at *4. As such, § 922(g)(1) is not unconstitutional as applied to Mr. Mitchell.

## CONCLUSION

For the reasons set forth by the Court, Defendant's motion to dismiss the indictment is hereby **DENIED**. Mr. Mitchell brings facial and as-applied challenges to § 922(g)(1). He contends that this Court should follow *Range* and uphold his as-applied challenge based on his status as a non-violent felon. The plain text of the Second Amendment presumptively covers Mr. Mitchell's conduct. However, the government has identified estate forfeiture laws against both

violent and non-violent felons as historical analogues to § 922(g)(1). Consequently, Mr. Mitchell's facial and as-applied challenge fail. The historical and current regulations share the same "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133. Because these historical regulations support applying restrictions on felons' possession of guns in the modern day, the Court upholds the constitutionality of § 922(g)(1).

**SO ORDERED.**

**Dated:**        **November 17, 2023**
                **New York, New York**

                                        **ANDREW L. CARTER, JR.**
                                        **United States District Judge**